### HUTCHISON v. HAMILTON et al.
### (No. 11907.)

Court of Civil Appeals of Texas. Fort Worth.
Feb. 11, 1928.

Rehearing Denied March 17, 1928.

Animals ⬤➡22—Contract to pasture defendants' cattle on "Cedar Lake pasture," containing 59 sections, held contract to lease 59 sections for pasturage purposes.

Contract whereby plaintiff agreed to pasture for defendants about 2,000 head of cattle on the "Cedar Lake pasture," containing 59 sections, and providing that plaintiff should remove all of his stock and that belonging to other parties in such pasture, and that no other cattle except defendants should be pastured thereon, *held* construable as an offer by plaintiff to lease 59 sections to defendants for pasturage purposes, authorizing defendants to set off against plaintiff's recovery on notes given for pasturage shortage in acreage amounting to one-third of total.

Appeal from District Court, Knox County; J. H. Milam, Judge.

Action by W. A. Hutchison against Robert Hamilton and others. From a judgment for the defendants, plaintiff appeals. Affirmed.

J. A. Wheat, of Seymour, W. H. Penix, of Wichita Falls, and Penix, Miller & Perkins, of Mineral Wells, for appellant.

Jas. A. Stephens and D. J. Brookreson, both of Benjamin, and J. S. Kendall, of Munday, for appellees.

BUCK, J. W. A. Hutchison sued Robert and Charles Hamilton, composing the partnership of Robert Hamilton & Son, and Minnie Bell Burnett, surviving wife of T. H. Burnett, and C. H. Burnett, on three notes of $2,000 each, dated August 22, 1918, and due and payable to the order of W. A. Hutchison on May 1, 1919, bearing interest at 8 per cent., with the usual 10 per cent. additional as attorney's fees. The notes are designated as being non-negotiable. The three notes were a part of a consideration of a contract and deal between plaintiff and the Hamiltons and Burnetts for the lease of a pasture or pastures in Gaines county, or for the pasturage of cattle on said lands.

The evidence shows that Charles Hamilton, C. H. Burnett, and a Mr. I. H. Spikes went to Lamesa, in Dawson county, in the summer of 1918, for the purpose of looking for some pasture land on which to graze their cattle; both the Hamiltons and Burnetts having large herds. At Lamesa they met Lige Davis, who had the pastures of Hutchison for rent or lease. They got in a car and went out to see the land, over in Gaines county. Defendant's witnesses testified that Mr. Davis, agent for Mr. Hutchison, told them that there were 59 sections in the pasture or pastures. When they got to the pasture, the visitors saw a large lake, which appeared to be impregnated with alkali, and they asked Davis about the lake, and he told them it was fenced off from the other part of the pasture and was not a part of the 59 sections, according to the testimony of the defendants. There appeared some fence posts between the pasture and the lake, and they did not go down to see the lake before the trade was made, but supposed the representations of Davis that the lake was fenced and was not a part of the 59 sections were true, and stated they relied thereon. After driving over the pasture, they went back to Lamesa and drew up and signed the following contract:

"The State of Texas, County of Dawson:
"This contract made and entered into by and between W. A. Hutchison, party of the first part, of Midland county, Texas, and Burnett, Spikes and Hamilton, parties of the second part, of Knox county, Texas, witnesseth:
"Said party of the first part agrees to pasture for said parties of the second part about 2,000 head of cattle on what is known as the Cedar Lake pasture, including two one-section pastures containing 59 sections, located in Gaines county, Texas, 12 miles southeast of Seagraves, a station on the Santa Fé Railroad.
"Party of the first part agrees that no other cattle shall be put in this pasture except second parties' cattle, and that said second parties are to have the exclusive control of same.

---

⬤➡For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

"Said first party is to receive second parties' cattle at Seagraves and take them out to the pasture, and said first party further binds himself to keep up said fence around pasture and to keep up waterings in good shape on same, and in case engines are needed to keep plenty of water on hand, first party is to furnish and run said engines.

"First party agrees to put a well in pumping shape that is now not used, located about one and a half miles southeast of Daisy Mills.

"First party agrees to deliver said cattle back to Seagraves at the expiration of this contract, or an equal distance in any other direction, but first party is not responsible for said cattle, but agree to use the same diligence in taking care of cattle as far as water and grass is concerned as if they were his own.

"First party agrees to move all stock that is now on said pasture as quick as he can get help to remove same.

"Parties of the second part agree to pay to the party of the first part the total consideration of eighteen thousand dollars, to be paid as follows: Six thousand cash, the receipt of which is hereby acknowledged, and two notes for six thousand each, one due the first day of January, 1919, and the other the first day of May, 1919, but it is agreed that if second parties should remove said cattle from said pasture that will mature said notes and they shall become due and payable on demand; said notes to draw 8 per cent. interest after maturity.

"This contract made and signed in duplicate either of which made used as the original.

"Witness our hands this the 22d day of August, 1918.

> "W. A. Hutchison,
> "Party of the First Part.
> "Jewell & Davis, by Agent,
> "C. H. Burnett,
> "King County Land & Cattle Co.,
> "By I. H. Spikes,
> "Robert Hamilton & Son,
> "Parties of the Second Part.
"Witness: H. M. Cosby."

Defendants paid the $6,000 cash, and subsequently paid the first note due January 1, 1919, but later refused to pay the second note due May 1, 1919, claiming that there was a shortage of some 20 sections in the tract, and claiming that the pasture had "turpentine weeds," which caused the cattle eating them to become emaciated and to lose their calves; that from some 2,000 head of she cattle put in the pasture only about 25 calves lived; and that they had to feed many of the cattle during the winter, by reason of such emaciation, due to eating the turpentine weeds and due to drinking the alkali water, and they lost some 100 or more head.

Plaintiff sued on notes insisting that evidence as to any claimed shortage of the acreage of the pasture was inadmissible; that, according to the contract made between plaintiff and defendants, plaintiff agreed to pasture for the parties of the second part about 2,000 head of cattle on what is known as Cedar Lake pasture; that he did not rent the pasture, but leased the privilege for defendants to pasture their cattle on his land. He objected also to testimony as to Cedar Lake and its alkali properties rendering its waters unfit for use, and causing the cattle to become emaciated and to lose their calves, and the presence of the turpentine weeds, etc. The trial court overruled the objection of plaintiff to defendants' claim of shortage in the area of the pasture, and found that there were only some 40 sections within the confines of the pasture, instead of 59 sections or 61 sections, the evidence being uncertain as to whether the representations were that there was 59 sections or 61 sections. Defendants further pleaded that the alkali lake was a part of the pasture and a part of the area represented by plaintiff's agent to be included therein, and that said alkali lake was not only unfit for pasturage, but was really a detriment to the land for pasturage purposes. They alleged that the lake comprised some 14 sections, but the evidence showed that it comprised 8½ sections. Moreover, the defendants claimed that the plaintiff violated his contract by grazing horses and cattle on the grass, while he had agreed to move all stock then on said pasture as quickly as he could get help to remove same. They further claimed and testified that they found a number of horses grazing on the lands, and were told that they belonged to a man named Carter. They went to see Carter, who apparently was living inside of the pasture fences, and he told them that he owned 4 sections within the pasture, and had a right to graze his horses. Plaintiff testified that Carter had lost all of his land, including a last one-half section, and that plaintiff went to see the First State Bank at Lamesa, and its officers told him that they then owned the land and gave him permission to pasture the same. But, as to this conflict in testimony, the finding of the trial court that there were only 40 sections in the pasture must control. Moreover, it appears from defendants' evidence that there were only 40 sections, inclusive of the four sections claimed to have been owned by Carter.

The trial court further found that there was a shortage, and that the plea of defendants constituted a good defense. Judgment was rendered for defendants, and plaintiff has appealed.

### Opinion.

The testimony of the surveyor, O. W. Lee, was that he made a survey and prepared a map or plat of the pasture, and that there were between 39 and 40 sections, approximately 25,000 acres. The plaintiff contended in the trial court, and contends here, that he never leased the pasture to the defendants, but merely leased the right to pasture 2,000 head of cattle therein; that there were 59 sections in the pasture, although some of said sections were only parts of sections; that it was the custom of people in that part of the country, cowmen, etc., to speak of a pasture

containing so many sections, although some of the section might be less than 640 acres.

The defendants' testimony is to the effect that they would not have leased the pasture or the right to pasture their cattle therein if they had known that the alkali lake was a part thereof, and was not fenced off from the other part of the pasture. They further testified that, if there had been 59 sections, there would have been an abundance of grass to carry the cattle through the winter with very little feed, but that, with only 39 or 40 sections, the grass became scarce, and the cattle became emaciated and required much feeding.

The testimony covers some 90 pages, and the appellant's and appellees' briefs cover many pages, but it appears to us that there is only one question to be determined in order to settle the issue made on this appeal; that is, Does a construction of the contract as written and signed by the parties justify the conclusion evidently reached by the trial court that the plaintiff offered to lease 59 sections and the defendants accepted said proposition? We see no practical difference between an offer to lease the entire pasture, represented to contain 59 sections, and the contract looking to the pasturage of 2,000 head of cattle. By the terms of the contract, the plaintiff agreed to remove all of his stock, and all of the stock belonging to other parties then in said pasture, and agreed that no other cattle except the defendants' should be pastured in said pasture. Therefore, in so far as the pasturage was concerned, there was an agreement entered into that the defendants were to have the entire and exclusive use of said 59 sections for pasturage purposes, and the evidence supports the conclusion of the trial court that there was a shortage amounting to one-third of the total acreage.

We find that the trial court was authorized to render judgment for the defendants, and the judgment is affirmed.